IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

JOHN A. DICKERSON, as the      *
Administrator of the Amy Sue
Walker Estate,      *

     Plaintiff,      *

vs.      *      CASE NO. 3:07-CV-111 (CDL)

AMERICAN NATIONAL PROPERTY AND      *
CASUALTY COMPANY,
     *
     Defendant.
     *

## O R D E R

This action arises from Defendant American National Property and Casualty Company's ("ANPAC") failure to settle John Bowen's bodily injury claim against ANPAC's insured. After ANPAC did not accept Bowen's time-limited settlement demand for the policy limit of $25,000, Bowen filed suit against ANPAC's insured and obtained a judgment of $3,703,227.50. Plaintiff John A. Dickerson ("Plaintiff"), the administrator of the estate of ANPAC's insured, contends that ANPAC negligently or in bad faith failed to settle with Bowen, resulting in the verdict in excess of policy limits. Presently pending before the Court are Defendant's Motion for Partial Summary Judgment (Doc. 75) ("MSJ I") and Defendant's Motion for Summary Judgment (Doc. 98) ("MSJ II"). For the reasons set forth below, both motions are denied.

SUMMARY JUDGMENT STANDARD

Summary judgment may be granted only if "the pleadings, the discovery and disclosure materials on file, and any affidavits show

that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The party moving for summary judgment has the burden to show that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the summary judgment movant meets its burden, the burden shifts and the nonmoving party must produce evidence to show that there *is* a genuine issue of material fact.  *Id.* at 324.   The nonmoving party must "go beyond the pleadings," *id.,* and point the Court to "specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2); *accord Celotex Corp.*, 477 U.S. at 324.

The movant is entitled to summary judgment if, after construing the evidence in the light most favorable to the nonmoving party and drawing all justifiable inferences in favor of the nonmoving party, no genuine issues of material fact remain to be tried. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). It is not enough to have *some* alleged factual dispute; there must be a genuine issue of material fact to defeat a motion for summary judgment. *Anderson*, 477 U.S. at 247-48. A fact is *material* if it is relevant or necessary to the outcome of the suit.  *Id.* at 248.  A factual dispute is *genuine* if the evidence would allow a reasonable jury to return a verdict for Plaintiffs—there must be more than "some metaphysical doubt as to the material facts." *Matsushita Elec.*

2

*Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *accord Anderson*, 477 U.S. at 248.

FACTUAL BACKGROUND

**1.   The Underlying Wreck, Settlement Demand and Lawsuit**

Viewed in the light most favorable to Plaintiff, the record reveals the following.

On the morning of March 2, 2002, Amy Sue Walker was driving a 1993 Nissan Altima on Georgia 15 in Clayton, Georgia when her vehicle crossed the center line into oncoming traffic and collided with a tractor trailer driven by John H. Bowen, causing Bowen's truck to go off the road, slide down an embankment, and roll over one full time. ANPAC insured Walker's vehicle, with bodily injury policy limits of $25,000 per person and $50,000 per occurrence.  That same day, ANPAC opened its claim file regarding the wreck, and claims manager Brent Hood assigned the file to ANPAC claims negotiator Danny Dudley. Dudley worked as a Claims Negotiator for ANPAC from 1986 until 2003. An ANPAC Claims Negotiator handles the most serious and complex bodily injury claims.  (Hood Dep. 22:18-23, Nov. 18, 2008.)

On June 18, 2002, Bowen's attorney, Stephen Carter, wrote to Dudley via fax, telling Dudley that he represented Bowen and asking whether Dudley would be handling the bodily injury claims arising out of the wreck.  (Ex. H to MSJ I.)  Carter stated that Bowen "suffered very serious injuries" in the wreck. (*Id.*)  Upon receiving Carter's letter, Dudley set the bodily injury claim reserve at $5,000.  (Ex. F to MSJ I, ANPAC Activity Log at 4; *see also* Dudley Dep. 57:19-58:5,

Nov. 20, 2008.)  Dudley responded to Carter's letter on June 19, 2002, advising Carter that Dudley was handling Bowen's bodily injury claim and asking that Carter keep Dudley informed of Bowen's condition.  (Ex. I to MSJ I.)  On June 25, 2002, Dudley made the following entry into ANPAC's activity log: "DANNY DUDLEY CONTACTED CLMT. ATTY. OFFICE ADVISED THINK THAT CLIENT HAS SOFT TISSUE INJURY." (Ex. F to MSJ I, ANPAC Activity Log at 5.)

On July 24, 2002, Carter wrote another letter to Dudley, asking Dudley to disclose ANPAC's policy limits.  Carter attached to the letter a "Verified Statement in Support of Claim," which explained that Bowen had surgery to his cervical spine as a direct result of the wreck and that additional surgery may be required.  (Ex. J to MSJ I at 2.)  Dudley received the letter via fax on July 24 and responded to Carter that same day, advising Carter of the $25,000 policy limit. (Ex. K to MSJ I.)  On September 18, 2002, Dudley made the following entry into the ANPAC Activity Log: "CLMT. ATTY. ADVISED THAT CLMT. [TREATING] SOFT TISSUE."[1]  (Ex. F to MSJ I, ANPAC Activity Log at 6; Dudley Dep. 67:14-15.)  Dudley also increased the bodily injury claim reserve from $5,000 to $10,000.  (Ex. F to MSJ I, ANPAC Activity Log at 6.)  Based on Dudley's investigation of the facts, Dudley

---

[1] Carter, who also represents Plaintiff in this action, contends that he did not speak to Dudley on September 18.  (*See* Pl.'s Resp. to ANPAC's Mot. in Limine 2.)  During his deposition, Dudley did not recall whether he made or received the call or whether he spoke with Carter or with someone else in Carter's office.  (Dudley Dep. 67:14-68:17.)  This fact is not material to the pending summary judgment motions.

determined that Walker was 100% liable for the March 2 wreck. (Dudley Dep. 75:21-76:8.)

Carter wrote a demand letter ("Demand Letter") to Dudley on October 22, 2002, demanding the $25,000 policy limit for Bowen in exchange for a limited liability release pursuant to O.C.G.A. § 33-24-41.1.[2]  (Ex. L to MSJ I at ANP97.)  The Demand Letter also stated that Bowen would hold ANPAC and its insured "harmless with respect to any liens arising under Georgia law should [the] demand/offer be accepted." (*Id.* at ANP100.)  In bold type, Carter stated that the demand would "remain open for acceptance until 5:00 p.m. on Friday, November 8, 2002, <u>or</u> until said demand/offer is <u>first</u> rejected, <u>whichever occurs first</u>." (*Id.* at ANP99.)  Additionally, Carter stated that the offer would "stand permanently withdrawn" and that Bowen would "seek to collect the full measure of . . . damages" against ANPAC's insured if Carter did not timely receive ANPAC's written acceptance of the offer.  (*Id.* at ANP100.)   Dudley received the Demand Letter on October 28, 2002.

Among other things, the Demand Letter stated that as a result of the Walker wreck Bowen suffered herniated discs in his neck and had to have a "two-level anterior cervical diskectomy and fusion."[3]  (Ex.

---

[2]O.C.G.A. § 33-24-41.1 provides for a limited release of an insurance carrier where a claim arising out of a motor vehicle accident is covered by two or more insurance carriers.

[3]ANPAC confuses the evidence on Bowen's two spinal surgeries. It is undisputed that Bowen had neck surgery in 2002 at cervical vertebrae C4-5 and C5-6.  ANPAC contends that Bowen also had prior neck surgery in 1999 at C4-5 and C5-6. (Def.'s Statement of Material Facts Not in Dispute ¶ 10.)  The evidence ANPAC cites in support of this assertion does *not* state

L to MSJ I at ANP98.)  The Demand Letter also explained that Bowen's lumbar spine was re-injured as a result of the Walker wreck, that Bowen had been out of work since the wreck, that Bowen continued to be medically disabled due to his injuries and that Bowen's average weekly wage prior to the wreck was $697.23.  (*Id.* at ANP99.) Attached to the Demand Letter were detailed medical records from various physicians documenting the treatment Bowen received for his injuries sustained in the Walker wreck, including a two-level "[a]nterior cervical diskectomy and fusion at C4-5 and C5-6 with instrumentation" (Ex. L to MSJ I at ANP140) and various items related to the neck surgery, such as a three-day hospital stay and radiology, anesthesiology, and pathology services (*see id.* at ANP131-ANP164). Also attached to the Demand Letter were medical records documenting Bowen's post-traumatic stress syndrome with depression and chronic pain; medical records documenting that Bowen was unable to return to work from the date of the wreck through at least January of 2003; and wage records from Bowen's employer that showed Bowen's average weekly earnings from September 6, 2001 to March 7, 2002 as $697.23 per week. (*See generally* Ex. L to MSJ I.)  Carter did not, however, enclose Bowen's medical bills; Carter explained in the Demand Letter that the medical bills were submitted directly to the worker's compensation

---

that Bowen's 1999 surgery was at C4-5 and C5-6; it states that Bowen's 1999 surgery was in his *lumbar* spine (his lower back).  (Ex. L to MSJ I at ANP98; *see also, e.g., id.* at ANP179, Letter from Dr. Cole to Dr. Payton, Aug. 24, 1999 (noting that 1999 surgery was at L5-S1).)  ANPAC points to no evidence that Dudley believed Bowen previously had neck surgery.

insurer for Bowen's employer.  (*Id.* at ANP99.)  After reviewing the Demand Letter, Dudley believed, based on the documentation he had received, that Bowen's damages exceeded $25,000, and Dudley increased the bodily injury claim reserve from $10,000 to the policy limit of $25,000. (Dudley Dep. 94:19-95:2; Ex. F to MSJ I, ANPAC Activity Log at 6.)   Dudley also concluded that Bowen's neck injury and aggravation of his preexisting lower back injury were related to the Walker wreck.  (Dudley Dep. 156:15-23.)

On November 1, 2002, Dudley, who had authority to accept the $25,000 settlement demand without management approval (Hood Dep. 113:6-13), responded to the Demand Letter via fax.  He did not accept or reject the demand/offer at that time.   In his fax, Dudley asked Carter to forward him Bowen's medical bills, and he also asked Carter to have Bowen's employer complete and return a wage form.  (Ex. M to MSJ I.)   Dudley requested the wage verification form so he could document Bowen's damages and justify a payment of the policy limit. (Dudley Dep. 95:3-15.)   Dudley also requested the medical bills to conclude his evaluation of the claim.  (*Id.* at 116:9-12.)  Carter responded to Dudley's fax on November 4, 2002, attaching the wage form completed by Bowen's employer. (Ex. N to MSJ I.)  According to the wage form, Bowen earned $542 per week in regular wages, plus an average of $205.96 per week in overtime, for a total of $747.96 per week.  (*Id.*)  The wage form also stated that Bowen had not returned to work since the Walker wreck occurred 35 weeks before.  (*Id.*) Carter also stated in the November 4 letter that Bowen's medical

providers had submitted their bills to the worker's compensation carrier for payment and that Carter did not have those records. (*Id.*)  Dudley did not respond to Carter's November 4 letter prior to November 8.  Dudley did not, prior to November 8, ask Carter for Bowen's worker's compensation claim file, which included Bowen's medical bills (Dudley Dep. 181:20-23), and Carter did not seek a release of the file so that Dudley could review it.  Dudley did not accept Bowen's offer to settle for policy limits before the November 8 deadline, and he did not ask for the deadline to be extended.  (*Id.* at 169:1-6.)  Dudley also did not attempt to contact ANPAC's attorneys with any questions he had concerning the legal consequences of accepting Bowen's demand/offer until after November 8.  (*Id.* at 166:23-167:7.)

On November 21, 2002, Dudley wrote a letter to Carter stating that Dudley had not received "the documentation requested on [Bowen's] injury."  (Ex. O to MSJ I.)  Dudley asked Carter to have the worker's compensation carrier forward its entire file so Dudley could "review the medical and wage claims."  (*Id.*)  Dudley also told Carter that he would need the worker's compensation lien information and a waiver of subrogation from Bowen's underinsured motorist insurance carrier.  (*Id.*)  Carter replied to the November 21 letter on November 29, 2002, stating that he did not have Bowen's medical bills because they had been sent directly to the worker's compensation carrier and that Carter believed the documentation attached to the Demand Letter "was more than adequate to document"

Bowen's claims.  (Ex. P to MSJ I.)  Carter also notified Dudley that the time had passed for accepting the October 22 demand/offer and that he would be filing a lawsuit on behalf of Bowen against ANPAC's insured.  (*Id.*)  Finally, Carter noted that he believed ANPAC's insured would have a negligent and/or bad faith failure to settle claim against ANPAC because of Dudley's failure to accept the time-limited demand/offer, and Carter indicated a willingness to discuss settlement of Bowen's claims against ANPAC's insured.  (*Id.*)

On December 2, 2002, Dudley sent Carter a fax asking that Carter "forward the information and file" for Bowen's worker's compensation claim.  (Ex. Q to MSJ I.)  Dudley noted in the fax that the worker's compensation carrier had "a subrogation claim and should have all the information needed to resolve the claim."  (*Id.*)  Finally, Dudley stated that Carter's "refusal to provide the information in [Dudley's] two requests has delayed the claim."  (*Id.*)  Carter did not respond to the December 2 fax.  It is undisputed that after Dudley asked for the worker's compensation file on November 21 and again on December 2, Carter did not attempt to obtain a release of Bowen's worker's compensation file or Bowen's medical bills so he could send them to Dudley.

Dudley left ANPAC in January of 2003, and Hood reassigned the Bowen claim to ANPAC claims representative Eric Austin on January 23, 2003.  On January 27, 2003, Austin reviewed the file, including the Demand Letter.  Austin noted in the activity log that "RECORDS SEEM CLEAR THAT CERV[ICAL] HERNIATIONS ARE LOSS RELATED.  WE HAVE NO MEDS

9

IN FILE, BUT WITH 25K POL[ICY] LIMIT, I FEEL WE HAVE ENOUGH DOCUMENTATION TO TENDER OUR LIMIT W/O FURTHER INFO." (Ex. F to MSJ I at 8.) That same day, Austin sent Carter a fax tendering the $25,000 policy limit to resolve Bowen's claim. (Ex. R to MSJ I.) Bowen did not accept. Rather, Bowen litigated his claim against ANPAC's insured. A Habersham County jury awarded him $3,703,115.00, and the judge entered a judgment in Bowen's favor for that amount plus Bowen's court costs of $112.50, for a total judgment of $3,703,227.50 against ANPAC's insured. (Ex. B to Compl.)

2. **ANPAC Employees With Information Related to this Action**

Austin joined ANPAC as a claims representative in 1998. (Austin Dep. 14:15-17, Nov. 19, 2008.) Between 1998 and 2001 or 2002, Austin took various courses on adjusting claims and progressed from property damage claims representative 1 to bodily injury claims representative 2 ("BI 2"). (*Id.* at 15:8-30:13.) BI 2 claims representatives at ANPAC handle complex bodily injury claims. Based on his experience as a claims adjuster, Austin estimated, without reviewing any medical bills, that the usual and customary charges for Bowen's neck surgery would have been between $30,000 and $50,000 in 2002. (*Id.* at 63:4-64:19.) In addition, based on the wage information from Bowen's employer and the medical records, which stated that Bowen would be medically disabled through at least January of 2003, Austin calculated that Bowen's lost wages from the time of the Walker wreck until January of 2003 would exceed $25,000. (*Id.* at 66:1-66:22; 72:21-74:6.) In Austin's opinion, the information provided by Carter

was sufficient to justify payment of the $25,000 policy limit to Bowen, and Austin would have accepted the demand/offer.  (*Id.* at 78:11-22.)

Hood, who was the claims manager over Dudley and Austin during 2002, joined ANPAC in the mid-1980s.  (Hood Dep. 12:13-16.)  Hood began his career as an adjuster's assistant (*id.* at 10:22) then became a property damage adjuster (*id.* at 13:11) and then a bodily injury adjuster (*id.* at 18:9-10).  Hood became a claims negotiator in 1994 (*id.* at 20:22-25) and later became an auditor trainer, who trained new property damage and bodily injury adjusters (*id.* at 27:23-28:4).  By 2002, Hood had become a claims manager, and he supervised Dudley and Austin.  As Hood progressed through ANPAC's hierarchy over the years, he took various courses on how to adjust claims.  (*Id.* at 13:17-15:5; 18:19-19:16.)

During Hood's tenure adjusting bodily injury claims, he evaluated hundreds of claims and, in doing so, reviewed medical expenses.  (*Id.* at 117:11-15.)  Based on Hood's experience adjusting claims, Hood opined without seeing any medical bills that the fees in 2002 for an MRI, hospital stay, surgery and related doctor fees could "easily" exceed $25,000.  (*Id.* at 117:16-119:6; 128:2-12.)  According to Hood, Dudley had sufficient documentation that Bowen's damages exceeded $50,000 (*id.* at 131:3-6), and Hood could not think of any reason why the $25,000 demand should not have been timely accepted (*id.* at 130:14-16).  Had he been handling the claim, Hood would have

immediately accepted the claim after receiving the wage form from Bowen's employer. (*Id.* at 132:3-13.)   In addition, according to Hood, if an adjuster has questions concerning the legal consequences of accepting a claimant's settlement demand/offer, the adjuster is required to ask such questions before the deadline for accepting the demand/offer. (*Id.* at 150:17-151:13.)

Dennis Smith is ANPAC's Director of Claims for the Eastern Division, which includes Georgia. (Smith Dep. 28:1-9, Nov. 19, 2008.) Smith has worked in the insurance industry since 1981, and he joined ANPAC in 1995 as a divisional claims manager. (*Id.* at 14:11-13; 24:15-17; 27:9-11.)   Since 1995, Smith has been responsible for supervising the claims division that handles Georgia automobile claims.   (*Id.* at 30:25-31:4.)   From 1995 until 2003, Dudley worked for a manager who reported to Smith.   (*Id.* at 33:4-7.)   According to Smith, "it was not unusual" for ANPAC to receive time-limited settlement demands, and ANPAC's claims adjusters and negotiators are "instructed very clearly to follow the law and to meet the requirements as needed for any particular claim." (*Id.* at 116:21-127:4.)   If an adjuster has legal questions about responding to a time-limited demand, he should, according to Smith, seek advice of counsel before the deadline for accepting the demand/offer. (*Id.* at 119:9-12.)

**3.   Claims and Defenses**

Plaintiff contends that ANPAC negligently or in bad faith failed to settle with Bowen for the policy limit.   Plaintiff also seeks

12

punitive damages and litigation expenses.  Though Plaintiff initially identified N. Wayne Yarbrough as an expert on insurance industry claims handling practices and procedures, Plaintiff voluntarily withdrew Yarbrough as an expert witness, and he now has no retained expert witness in this case, though he believes he can make out his case relying upon the testimony of ANPAC's own employees, Hood, Austin and Smith.  ANPAC argues that Plaintiff cannot prove his claims without a retained expert.  (*See generally* MSJ II.)  ANPAC argues in the alternative that even if Plaintiff can make out a negligent or bad faith failure to settle claim, his claims for punitive damages, litigation expenses and attorney's fees fail as a matter of law.  (*See generally* MSJ I.)

DISCUSSION

## I.  Does the Evidence Create a Genuine Issue of Material Fact Without a Retained Expert?

The first question for the Court is whether the evidence viewed in the light most favorable to Plaintiff creates a genuine issue of material fact on Plaintiff's negligent or bad faith failure to settle claim even though Plaintiff has no retained expert in the area of insurance claims handling standards.  The Court finds that it does.

Under Georgia law, if a liability insurer negligently or in bad faith refuses an offer to settle a claim within policy limits and a judgment in excess of policy limits is entered against the insured, then the insured may recover the excess judgment.  *Cotton States Mut. Ins. Co. v. Brightman*, 276 Ga. 683, 684, 580 S.E.2d 519, 521 (2003).

13

To prevail on a negligent or bad faith failure to settle claim, an insured must prove that "the insurer had a duty to settle the case, breached that duty, and [the] breach proximately caused damages to the insured beyond the damages, if any, contemplated by the insurance contract." *Delancy v. St. Paul Fire & Marine Ins. Co.*, 947 F.2d 1536, 1546-47 (11th Cir. 1991) (applying Georgia law).  The purpose of a bad faith claim is to prevent an insurer from "gambl[ing] with the funds of its insured by refusing to settle within the policy limits." *Id.* at 1547 (internal quotation marks omitted).

An insurer "does not act in bad faith solely because it fails to accept a settlement offer within the deadline set by the injured person's attorney." *S. Gen. Ins. Co. v. Holt*, 262 Ga. 267, 269, 416 S.E.2d 274, 276 (1992).  However, an insurer *does* have a duty to its insured "to respond to a deadline to settle a claim within policy limits *when the [insurer] has knowledge of clear liability and special damages exceeding the policy limits*." *Id.*; *accord Brightman*, 276 Ga. at 685, 580 S.E.2d at 521.  In addition, an insurer has a duty to accord its insured "the same faithful consideration it gives its own interest." *Holt*, 262 Ga. at 269, 416 S.E.2d at 276 (internal quotation marks omitted).  The question whether an insurer has met this duty is judged by the standard of an ordinarily prudent insurer, and the key question is whether the insurer "had an opportunity to make an effective compromise." *Brightman*, 276 Ga. at 685, 580 S.E.2d at 521.  An insurer acts in bad faith if it acts unreasonably in responding (or failing to respond) to a settlement offer. *Id.*  An

14

insurer is negligent in refusing to settle a claim if an ordinarily prudent insurer would consider it an unreasonable risk to try the case instead of settling it—meaning that the chance of an unfavorable result is not in reasonable proportion to the chance of a favorable result. *Id.*

ANPAC argues that it is impossible for Plaintiff to make out a claim under these standards because Plaintiff lacks a retained expert to testify about the "ordinarily prudent insurer" standard and how it applies in this case. However, a reasonable factfinder *could* conclude, without an expert, that ANPAC had knowledge of clear liability and special damages exceeding the policy limits. The evidence suggests that Dudley believed that Bowen's claim *was* a clear liability case: Dudley determined, based on his investigation of the facts, that Walker was 100% liable for the March 2 wreck. (Dudley Dep. 75:21-76:8.) Dudley also concluded that Bowen's neck injury and aggravation of his preexisting back injury were related to the Walker wreck. (*Id.* at 156:15-23.) Furthermore, the wage documentation before Dudley as of November 4, 2002 established that Bowen's lost wages damages alone exceeded the $25,000 policy limit. (*See* Ex. N to MSJ I (noting that Bowen averaged $747.96 and had been out of work for 35 weeks; simple multiplication reveals that Bowen's lost wages as of November 4, 2002 exceeded $26,000).) In addition, Dudley believed, based on the documentation he received with the Demand Letter, that Bowen's damages exceeded $25,000. (Dudley Dep. 94:19-95:2.) If a jury accepts these facts, no expert is necessary to

explain the duty or breach given the clear-cut duty enunciated in *Holt* for an insurer to settle clear liability cases where damages exceed policy limits.

Even if the factfinder concludes from the evidence that Bowen's claim was not a clear liability claim or that there is a question on whether the documented damages exceeded policy limits, the Court is not convinced that Plaintiff's failure to proffer a retained expert means, as ANPAC argues, that Plaintiff "has no evidence to prove that anything Dan Dudley did in responding to Bowen's settlement demand departed in any [way] from industry standards, custom or practice." (Def.'s Br. in Supp. MSJ II at 11.)  The question in this case boils down to whether a prudent insurer sitting in Dudley's shoes would have accepted Bowen's offer based on the medical records and wage forms he had before him as of November 4, 2002, without seeing Bowen's medical bills.  ANPAC attempts to blur this simple issue by arguing that the facts in the underlying case were "much more complicated than a standard policy limits demand in a clear liability case with documented specials well in excess of the policy limits."[4] (*Id.* at 10.)

A reasonable factfinder could conclude, based on the testimony of ANPAC's own employees, that a prudent insurer presented with the same documentation Dudley had would have accepted Bowen's offer to settle for policy limits—without having a copy of the medical bills.

---

[4]Again, as discussed above, a reasonable factfinder could conclude that Bowen's claim was, in fact, a clear liability case with documented specials well in excess of the policy limits.

The evidence suggests that within hours of reviewing Bowen's file after it was assigned to him (and with no more documentation than Dudley had), Austin determined that ANPAC had enough documentation to tender the policy limit without further information.  (Ex. F to MSJ I at 8; Ex. R to MSJ I.)  Furthermore, both Hood and Austin—who have knowledge, skill, experience and training in the insurance industry, including adjustment of bodily injury claims—both testified in their depositions that Dudley had sufficient documentation to justify the payment of $25,000 to Bowen (Austin Dep. 78:11-22; Hood Dep. 131:3-6) and that they would have immediately accepted Bowen's offer after receiving the wage form from Bowen's employer (Hood Dep. 132:3-13; Austin Dep. 78:11-22).  From this, a jury could find that Dudley acted unreasonably in failing to respond to Bowen's settlement demand.

ANPAC also argues that Bowen's demand was so complex that Dudley could not understand it and that Plaintiff needs an expert to explain how an insurance company would respond to the settlement conditions contained in the Demand Letter.  In the Court's view, this argument is a red herring.  The key question for the jury on this issue is whether Dudley did what a reasonable adjuster should do if he had concerns about the proposed settlement terms contained in the Demand Letter.  Nothing in the present record suggests that Dudley sought any advice regarding the settlement terms prior to the November 8 deadline for accepting the offer.  However, a jury could conclude, based on the testimony of Hood and Smith, that a reasonable adjuster

17

in Dudley's shoes with questions concerning the legal consequences of accepting Bowen's demand/offer was required to ask such questions *before* the deadline for accepting the demand/offer.  (Hood Dep. 150:17-151:13; Smith Dep. 119:9-12.)  Therefore, this issue does not mandate summary judgment.

ANPAC further contends that Dudley could not settle Bowen's claim because Carter "refused" to provide Dudley with Bowen's medical bills.  While the Court agrees that any action by Carter to hinder the settlement would be relevant to the question whether Dudley negligently or in bad faith failed to accept Bowen's demand/offer, the Court cannot conclude as a matter of law based on the present record that Carter *did* hinder Dudley's investigation.  First, as discussed above, a reasonable factfinder could conclude that the medical bills were not necessary for Dudley to pay Bowen the policy limit.  Moreover, even if the factfinder determined that it was reasonable for Dudley to insist on receiving the medical bills before paying the claim, the factfinder could also conclude that Dudley was at least partly to blame for Carter's failure to send the medical bills before the demand/offer deadline.  Prior to the deadline, the entire communication between Dudley and Carter regarding the medical bills was as follows: Dudley requested the medical bills on November 1, and Carter responded on November 4 that he did not have them.  A reasonable factfinder could conclude based on this exchange that a prudent person in Dudley's shoes would have realized that no medical bills were forthcoming from Carter absent a more specific request by

18

Dudley, such as the request that Dudley eventually made on November 21 when he asked Carter to have the worker's compensation carrier forward its entire file (Ex. O to MSJ I) or the request Dudley made on December 2 when he asked Carter to have Bowen authorize the release of the worker's compensation claim file and told Carter explicitly for the first time that the failure to provide the medical bills was delaying the claim (Ex. Q to MSJ I).  Thus, the Court cannot resolve this issue on summary judgment.

Finally, ANPAC suggests that Plaintiff must prove that the two-week deadline in the Demand Letter was reasonable and that he is unable to do so without an expert.  However, ANPAC has pointed the Court to no evidence that the deadline was *unreasonable* such that a prudent insurer in Dudley's shoes could not have met it as a matter of law.  Furthermore, a reasonable factfinder could conclude from the testimony of ANPAC's own witnesses that the deadline was not unreasonable because time-limited demands were not unusual (Smith Dep. 116:18-22) and the deadline would not have created an impediment for Hood or Austin to accept the demand offer.  The Court notes that in both *Holt* and *Brightman*, the Georgia Supreme Court found that a jury question existed on whether the insurance company negligently or in bad faith failed to accept a policy limits settlement offer that was only open for ten days.  *Brightman*, 276 Ga. at 685, 580 S.E.2d at 521; *Holt*, 262 Ga. at 267, 416 S.E.2d at 275.

19

For all of these reasons, the Court finds that Plaintiff has pointed to sufficient evidence to make out his negligent and/or bad faith failure to settle claim without a retained expert.

## II. Does the Evidence Create a Genuine Issue of Material Fact on Plaintiff's Claims for Punitive Damages and Litigation Expenses?

Having found that Plaintiff may proceed to trial on his negligent and/or bad faith failure to settle claim without a retained expert, the Court turns to the question whether the evidence viewed in the light most favorable to Plaintiff creates a genuine issue of material fact on Plaintiff's claims for punitive damages, litigation expenses, and attorney's fees. The Court finds that it does.

### A.   Punitive Damages Claim

Under Georgia law, punitive damages may be awarded if the plaintiff proves "by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences." O.C.G.A. § 51-12-5.1(b). Punitive damages are "awarded because of aggravating circumstances in order to penalize, punish, or deter a defendant." *Id.* § 51-12-5.1(a). To prevail on his punitive damages claim, Plaintiff must prove "[s]omething more than the mere commission of a tort" because "[n]egligence alone, even gross negligence, is insufficient to support punitive damages." *MDC Blackshear, LLC v. Littell*, 273 Ga. 169, 173, 537 S.E.2d 356, 361 (2000). Normally, the imposition of punitive damages is a question for the jury, but

summary judgment is appropriate if the summary judgment record does not suggest that a plaintiff could carry his burden of proof by showing clear and convincing evidence that the defendant acted with the requisite intent. *Artzner v. A & A Exterminators, Inc.*, 242 Ga. App. 766, 773, 531 S.E.2d 200, 206 (2000).

Based on the record before the Court, a reasonable factfinder could conclude that Dudley acted with conscious indifference to the consequences of failing to accept Bowen's demand/offer in a timely fashion. A party acts with "conscious indifference to consequences" where it acts "with a knowing or wilful disregard of the rights of another." *Wildcat Cliffs Builders, LLC v. Hagwood*, 292 Ga. App. 244, 246, 663 S.E.2d 818, 821 (2008). Viewing the evidence in the light most favorable to Plaintiff, Dudley knew that ANPAC's insured was 100% liable for the wreck, that Bowen suffered neck injuries that were caused by the wreck and required Bowen to miss work for at least 35 weeks, that Bowen's lost wages exceeded $25,000, and that the cost of Bowen's neck surgery alone likely exceeded $25,000. Despite having this knowledge of clear liability and damages exceeding the $25,000 policy limit, Dudley did not accept Bowen's demand/offer within the deadline, did not seek an extension of the deadline, and did not consult anyone regarding any questions he had about the legal consequences of accepting the demand/offer. Therefore, a reasonable factfinder could determine that Dudley knowingly disregarded the rights of ANPAC's insured. The Court thus denies ANPAC's motion for summary judgment on Plaintiff's punitive damages claim.

21

B.   Litigation Expenses Claim

If a defendant "has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense, the jury may allow" expenses of litigation, including reasonable attorney's fees, as part of the damages. O.C.G.A. § 13-6-11.  ANPAC contends that there is no genuine issue of material fact as to any of the three bases for litigation expenses under O.C.G.A. § 13-6-11.  However, the Court concludes that genuine issues of material fact do exist, so Plaintiff's litigation expenses claim survives summary judgment.  For purposes of O.C.G.A. § 13-6-11, "bad faith" means bad faith in the underlying transaction, and a plaintiff will survive a defendant's motion for summary judgment on this issue "by presenting *any* evidence which establishes a jury issue" on bad faith; even "slight evidence" is sufficient to meet a plaintiff's burden.  *Artzner*, 242 Ga. App. at 773, 531 S.E.2d at 206 (internal quotation marks omitted).  As discussed above, a reasonable factfinder could conclude that Dudley knowingly disregarded the rights of ANPAC's insured when he refused to accept Bowen's demand/offer.  Therefore, the Court concludes that there is sufficient evidence for Plaintiff to prove that ANPAC acted in bad faith, and ANPAC's motion for summary judgment on the issue of litigation expenses and attorney's fees is denied.

CONCLUSION

For the foregoing reasons, ANPAC's Motion for Partial Summary Judgment (Doc. 75) is denied, as is ANPAC's Motion for Summary Judgment (Doc. 98).


IT IS SO ORDERED, this 16th day of April, 2009.


                                        S/Clay D. Land
                                            CLAY D. LAND
                                        UNITED STATES DISTRICT JUDGE

23